UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| T.C.,<br>　　*Petitioner*,<br><br>　　v.<br><br>DENNIS MATULEWICZ, Acting United<br>States Marshal, District of Massachusetts, and<br><br>SAKO LONG, Regional Director, Northeast<br>Region, Commonwealth of Massachusetts,<br>Department of Youth Services,<br><br>　　*Respondents*. | No. 26-cv-12336-ADB |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
T.C.'S PETITION FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241
AND OPPOSITION TO T.C.'S REQUEST FOR A STAY OF EXTRADITION**

The Republic of Türkiye ("Türkiye") seeks the extradition of T.C. pursuant to the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty"), so that he may be prosecuted for killing one person and injuring four others on March 1, 2024, when he crashed into them while driving his mother's Porsche without a driver's license late at night on a dark and winding road at a speed approximately 87 miles per hour above the speed limit. Within hours of the crash, T.C. and his mother fled Türkiye for the United States, via Cairo, Egypt.

This Court previously considered and denied T.C.'s habeas petition challenging the Magistrate Judge's certification of extraditability. *See T.C. v. Kyes*, No. 24-cv-12458-ADB ("*Kyes*"), Dkt. 31. Thereafter, the Secretary of State authorized T.C.'s extradition to Türkiye. Before T.C. could be extradited, Türkiye issued an indictment against T.C. that charges the same substantive offense as Türkiye's extradition request—Causing Reckless Killing and Injury under

Article 85/2 of the Turkish Criminal Code—but adds a citation to a penalty enhancement for acting with "conscious recklessness" under Article 22/3 of the Code that Türkiye had not previously referenced in its submissions. T.C. sought to reopen his extradition hearing before the Magistrate Judge on the basis that the penalty enhancement is a new and materially different charge warranting reconsideration of the certification of extraditability. In denying T.C.'s motion to reopen, the Magistrate Judge found the penalty enhancement "does not set forth an independent offense," and in any event, "the facts the court found previously establish probable cause that T.C. acted with conscious recklessness." *In the Matter of the Extradition of T.C.*, No. 24-mj-01365-DLC ("MJ Dkt."), Dkt 183 at 5-7. Because T.C. cannot show the Magistrate Judge's holdings were clearly erroneous, his habeas petition should be denied. For these same reasons, T.C. cannot show he is likely to succeed on the merits of his petition or a future appeal, and the equities weigh against his requested stay.

## BACKGROUND

### I.    Legal Background

"In the United States, the procedures for extradition are governed by statute." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997). These statutes, 18 U.S.C. §§ 3181 *et seq.*, establish "a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." *Id.* (footnote omitted). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Id.*

Under 18 U.S.C. § 3184, the judicial officer serving as the extradition court—here, the Magistrate Judge—"upon complaint, issues an arrest warrant for an individual sought for extradition" and then conducts a hearing to determine if "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." Specifically, the extradition court determines whether (1) it is authorized to conduct the extradition, (2) it has jurisdiction over the fugitive, (3) the applicable treaty is in full force and effect, (4) the treaty covers the offenses for which extradition is sought, and (5) there is probable cause to believe the fugitive committed the alleged offenses. *See* 18 U.S.C. § 3184; *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984). If the Court finds that the requirements for certification are satisfied, it shall provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it shall order the fugitive detained to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see also Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993). The Secretary or his delegee (hereinafter, "the Secretary of State") will then decide whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.") (citations omitted).

A fugitive cannot directly appeal a certification order but may seek limited review by filing a petition for writ of habeas corpus. *See, e.g.*, *Kin-Hong*, 110 F.3d at 107-108 & n.3; *Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir. 1991).

3

## II.    Factual Background[1]

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving a Porsche owned by his mother, Eylem Tok. Ex. C at 4, 6, 19, 29, 38, 42, 44, 47, 55. In addition to T.C., there were three passengers in the car. *Id.* at 4, 6-7, 39, 40, 42-43, 45, 47. T.C.'s friend, D.O.O., was driving another vehicle, also with passengers, directly behind T.C.'s vehicle. *Id.* at 7, 38-39, 45. According to statements provided by T.C.'s friends to Turkish authorities, around 11:20 p.m., T.C. suddenly began driving his vehicle faster after they passed a speed bump in the road. *Id.* at 5, 25, 27, 29, 38. While the speed limit on the road was 30 kilometers per hour (approximately 18 miles per hour), T.C. was driving 170-180 kilometers per hour (approximately 105 to 111 miles per hour). *Id.* at 5-6, 37. T.C.'s passengers requested that he slow down, but he did not do so. *Id.* at 6-7, 40, 43. The passengers then put on their seat belts "just in case." *Id.* at 40. T.C.'s vehicle approached a curve in the road, and according to T.C.'s friends, T.C. was driving too fast through the bend. *Id.* at 6-7, 39-41, 43. At the same time, five individuals with all-terrain vehicles ("ATVs") had stopped on the right side of the road just past the bend, where they were trying to fix one of the ATVs that had broken down. *Id.* at 5, 13, 15-16, 18. The ATV riders had turned on the hazard lights on the four working ATVs and turned the headlights of one of the ATVs toward the road to call attention to their presence. *Id.* at 5, 13, 16. In an attempt to avoid hitting the people on the side of the road, T.C. suddenly turned the steering wheel to the left, but the sudden turn caused the car to skid and crash into them. *Id.* at 6-7, 39-41, 43. T.C.'s car ended up in a water channel on the other side of the road and the airbags deployed. *Id.* at 6-7, 39, 41, 43, 45. After the crash, T.C. and his passengers got out of the vehicle. *Id.* Two of the ATV riders (I.G. and H.T.) were lying on the

---

[1] The facts in this section are taken from Türkiye's Request for the Extradition of T.C. ("Extradition Request"), a redacted copy of which is filed as Exhibits A through C hereto.

side of the road, two (S.K. and O.M.A.) had been knocked down a cliff, and one (T.A.) was under T.C.'s car. *Id.* at 5, 7, 13, 16, 39, 41, 43, 45. O.M.A. died from internal bleeding as a result of the crash; T.A. suffered life-threatening injuries; I.G. was in shock, lost consciousness, and suffered serious injuries; H.T. was injured and lost consciousness; and S.K. was also injured. *Id.* at 4-5, 13, 16, 18. After the crash, witnesses reported hearing T.C. repeatedly say, "My life is over." *Id.* at 7, 41, 43.

According to witnesses, T.C. and his friends had been driving around for some time before the crash and had stopped at a liquor store to buy cigarettes. *Id.* at 38-39, 44-45. None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. fled the scene before any tests could be performed. *Id.* at 7. A mechanical engineer examined the Porsche that T.C. was driving and found no mechanical issues that would have caused the car to malfunction. *Id.* at 37. Neither T.C. nor his friends had driver's licenses. *Id.* at 6-7, 45.

Immediately after the crash, T.C. called his personal driver and his mother, Eylem Tok ("Tok"). *Id.* at 39, 45. About ten minutes later, Tok arrived at the scene and took T.C. and two of his friends home. *Id.* T.C. then fled Türkiye. *Id.* at 7. Surveillance footage at the airport reflects that T.C. and Tok arrived at the airport by 2:11 a.m. on March 2, 2024, barely three hours after the crash. *Id.* at 49. T.C. and Tok traveled to Cairo and continued on to the United States, landing in New York later that day. *Id.* at 4, 7, 51-52.

## III.    Procedural Background

On March 7, 2024, a judge of the Istanbul 7th Criminal Judgeship of Peace issued an arrest warrant for T.C. for the offense of Causing Reckless Killing and Injury in violation of Articles 85/2 and 31/3 of the Turkish Criminal Code. Ex. C at 59. On April 3, 2024, Türkiye transmitted

its extradition request to the United States. Ex. A at 4. After vetting by attorneys at the Departments of State and Justice, the Southern District of Florida swore out a complaint for the extradition of T.C. on the charge of Causing Reckless Killing and Injury, and a magistrate judge in that district issued a warrant for T.C.'s arrest. Exs. D & E. T.C. was arrested in Boston on June 14, 2024.

In October 2024, the Magistrate Judge held an extradition hearing pursuant to 18 U.S.C. § 3184. After holding that hearing and considering the parties' extensive briefing, the Magistrate Judge certified T.C.'s extradition to the Secretary of State under 18 U.S.C. § 3184. MJ Dkt. 157 at 1, 38. Among other things, the Magistrate Judge found that (1) he had authority to conduct the extradition proceeding, (2) the court had jurisdiction over T.C. because he was arrested in Massachusetts, (3) the Treaty was in full force and effect, (4) the charge of Causing Reckless Killing and Injury, in violation of Article 85 of the Turkish Criminal Code, was covered by the Treaty, and (5) there was probable cause to believe that T.C. committed this offense. In reaching these conclusions, the Magistrate Judge rejected T.C.'s argument that Türkiye was seeking his extradition for "a possible, yet-to-be-determined prosecution," and instead found, consistent with case law considering similarly worded treaties, that the Treaty does not require Türkiye to formally charge T.C. with an offense prior to extradition. *Id.* at 20-31. Additionally, the Magistrate Judge referenced T.C.'s "driving a Porsche at more than five times the speed limit late at night on a two-lane road and not listening to requests by passengers in the Porsche to slow down" in finding that, "[a]lthough not intentional, such conduct was nonetheless reckless." *Id.* at 17-18; *see also id.* at 31 ("More, the prosecutor's report meticulously sets out the facts, including the warnings to T.C. to slow down and the excessive speed that he drove the Porsche. The report also recounts T.C. taking the corner at an 'extreme high-speed' and losing control of the vehicle. This bears upon T.C. engaging in reckless conduct."); *id.* at 31-33 (probable cause discussion).

On February 25, 2025, T.C. sought habeas relief under 28 U.S.C. § 2241 on the ground that he had not been "charged with an offense" as required by the Treaty. *See generally Kyes*, Dkts. 18, 22. This Court came "to the same conclusion as did the Magistrate Judge" and dismissed T.C.'s habeas petition after finding that the Treaty "does not require formal charges in the way the United States justice system conceptualizes them." *Id.*, Dkt. 31 at 11. The Court also denied T.C.'s request for a stay of his extradition pending appeal after finding that T.C. was not likely to succeed on the merits of his appeal given the "formidable body of caselaw finding that the use of the term 'charged' in a treaty does not require formal charges." *Id.*, Dkt. 38 at 2.

T.C. appealed the denial of his habeas petition to the First Circuit and sought and received several extensions of the briefing schedule while he simultaneously presented humanitarian claims to the Secretary of State. *See generally T.C. v. Kyes*, No. 25-1752 (1st Cir.). On or about February 17, 2026, the Secretary of State notified T.C. that he had decided to issue a surrender warrant. T.C. then obtained an administrative stay of his extradition from the First Circuit pending full briefing on his stay motion, *id.*, but before T.C. could file his opening appeal brief, the Chief Public Prosecutor in Türkiye returned an indictment charging T.C. with causing death or injury with conscious recklessness, citing Articles 85/2 and 31/3 of the Turkish Criminal Code—as in the underlying extradition request—and adding a citation to Article 22/3 of the Code. Ex. F at 16. Article 22/3 provides that a penalty for the offense shall be increased by one-third to one-half when the "act is conducted with conscious recklessness when the result is foreseen but not desired." *Id.* at 14.[2]

---

[2] In contrast, Article 22/2 provides that ordinary "[r]ecklessness is defined as conducting an act without foreseeing the results as stated in the legal definition of the offence, due to a failure to discharge an obligation of care and attention." Ex. F at 14.

Because the indictment mooted T.C.'s appeal, which was premised solely on the argument that he had not been "charged" with an offense under the Treaty, T.C. moved to dismiss his appeal, and the administrative stay of his extradition was thereby dissolved. *See T.C. v. Kyes*, No. 25-1752 (1st Cir. Mar. 20, 2026). Simultaneously, T.C. sought to re-open the extradition proceedings before the Magistrate Judge on the basis that the reference to Article 22/3 was a material change warranting reconsideration of the certification of extraditability. *See generally* MJ Dkt. 176. T.C. also filed a new motion to stay his extradition. MJ Dkt. 177. On May 18, 2026, the Magistrate Judge found "no basis" to grant T.C.'s motion to reopen. MJ Dkt. 183 at 5. As an initial matter, the Magistrate Judge questioned whether the court even had authority to consider T.C.'s motion after the court had already issued the certification of extraditability to the Secretary of State. *Id.* In any event, the Magistrate Judge agreed with the government that Article 22/3 "does not set forth an independent offense" and deferred to Türkiye's interpretation of Article 22/3. *Id.* at 5-6. The Magistrate Judge further held that "the facts the court found previously establish probable cause that T.C. acted with conscious recklessness." *Id.* at 6-7. The Magistrate Judge also denied T.C.'s motion to stay his extradition pending the resolution of his motion to reopen the extradition hearing as moot and denied T.C.'s further request to stay his extradition pending this habeas petition because T.C. "fails to make a strong showing that he is likely to succeed in a habeas petition" or face irreparable harm. MJ Dkt. 184.

On May 22, 2026, T.C. filed his instant habeas petition seeking to overturn the certification of extraditability on the basis that Article 22/3 is outside the scope of the existing certification and also violates Articles 7 and 16 of the Treaty. Dkt. 1. T.C. also moves the Court to stay his extradition pending resolution of his habeas petition and any corresponding appeal. Dkt. 2. Because Article 22/3 is a penalty enhancement that courts are not required to consider in an

extradition hearing, and because the Magistrate Judge concluded that the facts the court found previously establish probable cause that T.C. acted with conscious recklessness, his habeas petition should be denied. For these same reasons, T.C. cannot show he is likely to succeed on the merits or suffer irreparable harm, and his stay motion should also be denied.

## ARGUMENT

### I.  Standard of Review

In the extradition context, habeas corpus review is available "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty, and [3] by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (emphasis added); *see also Kin-Hong*, 110 F.3d at 110. This review is "not meant to be 'a means for rehearing what the magistrate already decided.'" *Koskotas*, 931 F.2d at 171 (quoting *In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989) (quoting *Fernandez*, 268 U.S. at 312)).

In evaluating T.C.'s petition, the Court must apply the clearly erroneous standard and "uphold the judge's finding of probable cause 'if there is any competent evidence in the record to support it.'" *Kyes*, No. 24-cv-12458-ADB, Dkt. 31 at 7 (quoting *Ordinola v. Clark*, 402 F. Supp. 2d 667, 673 (E.D. Va. 2005) and *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006)). Mixed questions of law and fact and pure questions of law are reviewed *de novo. Id.* at 7-8 (citing *Ahmad v. Wigen*, 726 F. Supp. 389, 408 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990)).

Unlike criminal statutes, extradition treaties are to be construed liberally in order to effectuate their purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *In re Extradition of Nezirovic*, No. 12-mc-00039, 2013 WL 5202420, at *5 (W.D.

Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted). Deference is owed to the treaty partners on the meaning of the terms in a treaty. *See, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (giving deference to the interpretation of a treaty provision as set forth in diplomatic notes exchanged between the responsible agencies of the United States and Yugoslavia); *Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) (finding that the U.S.-Colombia extradition treaty was in full force and effect because, *inter alia*, both the United States and Colombia understand it to be in effect); *see also BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (courts must "give 'the specific words of [a] treaty a meaning consistent with the shared expectations of the contracting parties.'") (quoting *Air France v. Saks*, 470 U.S. 392, 399 (1985)). Even where a treaty's text is ambiguous, if it "reasonably accommodates" the government's construction, the court "defers to that construction whether or not it is a construction we would adopt de novo." *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (citing *Kin-Hong*, 110 F.3d at 110).

## II.    Article 22/3 Does Not Set Forth an Independent Offense that Requires Reopening

T.C. cannot show that the Turkish indictment undermines the validity of the Magistrate Judge's certification because the reference to Article 22/3 did not add a new offense for purposes of T.C.'s extraditability. Contrary to T.C.'s contention, Article 22/3 "does not constitute an independent offense in terms of the Turkish law but it has an aggravating nature," Ex. F at 13, in that it constitutes a penalty enhancement. *Id.* at 14 (Article 22/3 provides that "[a]n act is conducted with conscious recklessness when the result is foreseen but is not desired; in this case the penalty for the reckless offence shall be increased by one-third to one-half.").

As the Magistrate Judge found, MJ Dkt. 183 at 5, deference to Türkiye's interpretation of its own laws is appropriate because "[e]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law,' and American extradition courts therefore

10

have consistently cautioned against doing so . . . ." *Noeller v. Wojdylo*, 922 F.3d 797, 805 (7th Cir. 2019); *see also Nezirovic*, 2013 WL 5202420, at *15 ("It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law."). Deference to Türkiye's interpretation of its own laws is also consistent with the principle of international comity and "respect for the sovereignty of other nations," *Matter of Assarsson*, 635 F. 2d 1237, 1244 (7th Cir. 1980), and avoids the risk that a U.S. court might erroneously interpret the law of a foreign country. *Id.* ("The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."). The Court should therefore conclude that the addition of Article 22/3 in the indictment does not require reopening of T.C.'s extradition proceedings.

The Declaration of Attorney Fazil Ciftci, Dkt. 11-1, does not change this result. Because deference is owed to the Turkish government's interpretation of its own law, the Declaration is outside the scope of this Court's review. Even if the Court were to consider this declaration, it does not enhance T.C.'s argument. Indeed, it merely contends what the government has already acknowledged—that Article 22/3 serves as a penalty enhancement that requires notice and additional factual and legal analysis before it can be applied. Notably, this is entirely consistent with the Magistrate Judge's finding that Article 22/3 operates in the same manner as drug-weight enhancements under U.S. criminal laws, MJ Dkt. 183 at 6, which by their nature also require notice and additional factual and legal analysis—for instance, evidence concerning the weight, type, and purity of the narcotics. Courts have consistently and repeatedly held that penalty enhancements need not be proven in extradition proceedings so long as the underlying criminal charge—in this case, Article 85/2—carries a penalty that meets the treaty-minimum. *See, e.g.*, *Matter of Extradition of Caro*, 283 F. Supp. 3d 993, 1002-04 (D. Colo. 2017) (finding that penalty

11

enhancement provisions did not alter the basic terms of the crime for which extradition was sought); *Matter of Extradition of Moglia*, 813 F. Supp. 1438, 1450 (D. Haw. 1993) (finding probable cause without addressing circumstances that would give rise to an aggravated penalty). Because the underlying facts of T.C.'s offense and the essential elements of the charge remain unchanged, there was no basis for the Magistrate Judge to reopen the extradition hearing or reconsider the probable cause finding.

### III.    The Magistrate Judge's Finding That T.C. Acted with Conscious Recklessness Is Not Clearly Erroneous

In denying T.C.'s motion to reopen the extradition hearing and reconsider the extraditability certification, the Magistrate Judge specifically held that,

> even assuming dubitante that Article 22/3 sets forth an offense, and that a finding of probable cause for an Article 22/3 offense is necessary, and that reconsideration is therefore conceptually appropriate, it still would not avail T.C. of any benefit here because the facts the court found previously establish probable cause that T.C. acted with conscious recklessness.

MJ Dkt. 183 at 6-7. In reaching this conclusion, the Magistrate Judge found that the evidence that T.C. "was driving at a high speed more than five times the speed limit late at night on a two-lane road[; and] . . . ignored the requests by passengers to slow down" made the crash and resulting death of one of the ATV riders and injuries to the four others "easily foreseen by T.C. even though he did not wish or desire to cause the death or injuries"—that is, conscious recklessness as defined in Article 22/3. This finding is not clearly erroneous.

In conducting this analysis, the Magistrate Judge confirmed T.C. has the relief he seeks: a probable cause finding on the conscious recklessness theory. T.C. argues that he should have an opportunity to contest the conscious recklessness theory, but he cites no evidence and makes no

argument either in his motion to reopen or in the instant habeas petition that would undermine this finding, because there is none.[3]

## IV.  Article 7 of the Treaty Has Been Satisfied

T.C.'s technical argument that, by not previously providing the text of Article 22, Türkiye failed to fulfil its obligations under Article 7 of the Treaty, likewise fails. Article 7(1)(e) requires an extradition request to include, among other things, the "text of the applicable laws of the Requesting Party, including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings or the enforcement of the penalty for the offense." Ex. A at 14. Here, Türkiye provided the relevant text of the underlying substantive charge, Article 85/2, including its elements and minimum punishment, prior to the issuance of the certificate of extraditability. As noted above, the Magistrate Judge was not required to find that the penalty enhancement had been proven, so long as the underlying criminal charge satisfied the Treaty. *E.g.*, *Caro*, 283 F. Supp. 3d at 1002. Indeed, with respect to the court's extraditability certification, the primary purpose of this provision of Article 7 is to ensure that the offense for which extradition is sought satisfies the minimum penalty requirement set forth in the Treaty.[4] Here, Article 2 of the Treaty states that an offense is extraditable if it is punishable "by deprivation of liberty at least for a period exceeding one year or by a more severe penalty." Ex. A

---

[3] Similarly, T.C.'s due process rights have not been violated because the Magistrate Judge need not consider whether ordinary or conscious recklessness applies when determining whether to certify extradition on a charge under Article 85/2, but in any event, the Magistrate Judge has now confirmed that it considered the issue and therefore T.C. was given all the process that was due.

[4] T.C.'s contention that the Magistrate Judge incorrectly found that the entirety of Article 7(1)(e) serves the sole purpose of determining whether the Treaty's minimum penalty provision has been met misunderstands the point. The requirement to provide the laws prescribing the punishment for the offense is to effect the minimum penalty provision. The other information required by Article 7(1)(e) is necessary for the requested state to evaluate other requirements for extradition, such as probable cause (definition of the offense) and that the request is not barred by lapse of time (statutes of limitation).

at 9. T.C. does not dispute that the penalty for violating Article 85/2—with or without the Article 22/3 penalty enhancement—is punishable by more than a year in prison.

What's more, T.C.'s ultimate potential penalty is not an issue for this Court to consider, but instead, is a matter reserved for the Secretary of State. The Supreme Court, the First Circuit, and myriad other courts have recognized, under the longstanding rule of non-inquiry, that "questions about what awaits the [fugitive] in the requesting country" are reserved for the Secretary and are not judicially reviewable. *Kin-Hong*, 110 F.3d at 111; *see also Koskotas v. Roche*, 740 F. Supp. 904, 916-17 (D. Mass. 1990). Pursuant to the rule of non-inquiry, "courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country." *Kin-Hong*, 110 F.3d at 110 (internal quotations and citation omitted). "The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers." *Id.* "It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." *Id.* at 111.

Because extradition treaties are to be construed liberally in order to effectuate the surrender of fugitives to the requesting country, *Factor*, 290 U.S. at 303, and because there is no dispute that T.C. is subject to the minimum penalty under the Treaty, there is no basis to reopen the extradition hearing or overturn the extradition certification pursuant to Article 7 of the Treaty.

## V.    The Indictment Does Not Violate the Rule of Specialty or Article 16 of the Treaty

Contrary to T.C.'s contention, the reference to Article 22/3 in the indictment does not violate the rule of specialty laid out in Article 16 of the Treaty. That section provides, as relevant here, that a "person *who has been extradited* in accordance with this present Treaty shall not be

prosecuted, punished or detained for the enforcement of a sentence or subjected to any other restrictions on personal freedom . . . for any offense committed prior to surrender from the territory of the Requested Party other than that for which extradition was granted," except "[i]f there is an express consent of the Requested Party." Ex. A at 22 (emphasis added). The plain text of Article 16 shows it applies only to those who have already been extradited, not those awaiting extradition such as T.C. Because T.C. has not yet been extradited, there can be no violation of Article 16 or the rule of specialty.

Additionally, as explained above, the reference to Article 22/3 is not a new charge but a potential penalty enhancement, and thus the rule of specialty is not implicated because the underlying Article 85/2 charge remains unchanged. Even if it were changed (it is not), the rule of specialty "does not require that a defendant be prosecuted only under the precise indictment that prompted his extradition" or "that the prosecution always be limited to specific offenses enumerated in the surrendering state's extradition order." *United States v. Saccoccia*, 58 F.3d 754, 767 (1st Cir. 1995) (citing *United States v. Andonian*, 29 F.3d 1432, 1435-36 (9th Cir. 1994), *cert. denied*, 513 U.S. 1128 (1995)). Rather, the rule of specialty "must be applied in a practical, commonsense fashion." *Id*. Indeed, "the principle of specialty does not impose any limitation on the particulars of the charges lodged by the requesting nation, nor does it demand departure from the forum's existing rules of practice (such as rules of pleading, evidence, or procedure)." *Id.* (citing *United States v. Alvarez-Moreno*, 874 F.2d 1402, 1414 (11th Cir. 1989), *cert. denied*, 494 U.S. 1032 (1990)), and *Demjanjuk v. Petrovsky*, 776 F.2d 571, 583 (6th Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986)). Rather, the Court must consider the totality of the circumstances and whether the charge in the indictment is "interconnected with (as opposed to independent from) the acts for which he was extradited." *Id.* (citing *Andonian*, 29 F.3d at 1435; *United States v. Cuevas*,

15

847 F.2d 1417, 1427-28 (9th Cir. 1988), *cert. denied*, 489 U.S. 1012 (1989); *United States v. Paroutian*, 299 F.3d 486, 490-91 (2d Cir. 1962)). Here, there can be no dispute that the indictment encompasses conduct interconnected with the acts for which the Magistrate Judge certified extraditability where the evidence is the same and the underlying substantive charge remains unchanged.

Courts routinely find that the charges identified in an indictment do not need to mirror exactly the charges in the extradition request. *E.g.*, *United States v. Levy*, 25 F.3d 146, 159 (2d Cir. 1994) (finding rule of specialty not violated where defendant, extradited to the United States on a narcotics conspiracy charge, was tried on additional drug trafficking charges because they were not actually separate offenses); *United States v. Rossi*, 545 F.2d 814, 815 (2d Cir. 1976) (no violation of the rule of specialty where superseding indictment involved same basic offenses as indictment on which extradition was granted), *cert denied*, 430 U.S. 907 (1977); *Fiocconi v. Attorney General of the United States*, 462 F.2d 475, 478, 480-82 (2d Cir. 1972) (finding no specialty violation for defendants prosecuted "for subsequent offenses of the same character as the crime for which they were extradited), *cert denied*, 409 U.S. 1059 (1972). Likewise here, the indictment of T.C. involves the same offense of the same character as the charge for which the Magistrate Judge certified extraditability.

Moreover, the United States, not T.C., is the relevant party to raise a specialty claim, if any, with the requesting party, Türkiye. Indeed, Article 16(1)(c) and (2) of the Treaty provides that the requested party—here, the United States—may consent to the prosecution of an extradited person for an offense committed prior to the surrender other than that for which extradition was granted. Ex. A at 22; *see also Saccoccia*, 58 F.3d at 766-67 (stating that the rule of specialty "is grounded in international comity rather than in some right of the defendant" and "may be waived

16

by the asylum state") (citing *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986) (explaining that the rule of specialty is "a doctrine based on international comity" and that "the protection exists only to the extent that the surrendering country wishes")). Under 18 U.S.C. § 3186, the Secretary of State decides on extradition and surrender and memorializes that decision in a surrender warrant specifying the crimes or offenses for which extradition is granted. The Secretary of State decides whether and in what manner to approach a foreign state regarding possible violations of the rule of specialty, because the right to insist on its application belongs to the requested state, not the individual whose extradition is requested. *See* Ex. A at 22.

Because T.C. is not the relevant party to raise a rule of specialty claim and, in any event, the rule of specialty does not require exact mirroring of charges, his petition fails to show that his extradition hearing should be reopened or that the certificate of extraditability should be overturned on this basis.

## VI.    Because T.C. Is Not Likely to Succeed on the Merits or Suffer Irreparable Harm, His Stay Motion Should Be Denied

To obtain a stay, T.C. must "(1) make a 'strong showing that [he is] likely to succeed on the merits' . . . ; (2) show that [he] 'will be irreparably injured absent a stay'; (3) show that 'issuance of the stay will [not] substantially injure the other parties interested in the proceeding'; and (4) show that the stay would serve 'the public interest.'" *New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

As detailed above, T.C. is unlikely to succeed on his habeas petition or a future appeal because Türkiye is proceeding on the same Article 85/2 charge in the indictment as it did in the

extradition request. The inclusion of a citation to Article 22/3 concerns his potential penalty, and the Court's review of T.C.'s potential penalty is limited to whether a violation of Article 85/2 is punishable by more than a year in prison. Critically, the Magistrate Judge stated that the facts he found previously establish probable cause that T.C. acted with conscious recklessness, MJ Dkt. 183 at 6-7, and T.C. makes no attempt to show this finding was clearly erroneous. As the Magistrate Judge found in denying T.C.'s requested stay before him, T.C.'s "prospective habeas petition is relatively weak." MJ Dkt. 184, ¶ 5.

T.C.'s failure to show that he is likely to prevail on the merits is fatal to his stay motion because "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (citation  omitted). It is true that if a stay is denied, T.C. could be extradited, in which case his pending claims will be moot. But, as this Court previously agreed, *Kyes*, Dkt. 38 at 3, "[t]his is the harm facing every petitioner who lacks meritorious habeas corpus claims challenging an impending extradition." *Venckiene v. United States*, 929 F.3d 843, 864 (7th Cir. 2019). The weakness of T.C.'s claim means that he will not suffer irreparable injury if a stay is denied as further judicial review "could only delay but not prevent extradition." *Jimenez v. U.S. Dist. Court for S. Dist. of Fla.*, 84 S. Ct. 14, 19 (1963) (Goldberg, J., in chambers). Consistent with the foregoing, the Supreme Court, circuit courts, and myriad other courts routinely deny stays of extradition notwithstanding claims of irreparable injury. *See, e.g.*, *Rana v. Engleman*, No. 25-1053, 2025 WL 719820 (9th Cir. Feb. 21, 2025); *Sridej v. Blinken*, No. 24A236 (Sept. 6, 2024) (Kagan, J.); *Yoo v. United States*, No. 22A384 (Nov. 3, 2022) (Sotomayor, J.); *Venckiene*, 929 F.3d 843; *Froude v. Milusnic*, No. 17A774 (Jan. 23, 2018) (Kennedy, J.); *Morales v. Elks*, No. 17A445 (Nov. 15, 2017) (Roberts, C.J.); *Ye Gon v. Dyer*, 137 S. Ct. 347 (2016); *Gutierrez v. United States*, 136 S. Ct. 998 (2016).

Moreover, a stay is not in the public interest. The Supreme Court has stated that "[t]he surrender of a fugitive, duly charged in the country from which he has fled with a nonpolitical offense and one generally recognized as criminal at the place of asylum, involves no impairment of any legitimate public or private interest." *Factor*, 290 U.S. at 293-94. The United States' "[f]ailure to comply with foreign nations' proper extradition requests threatens to erode the effective force of these treaties" and the "confidence" that those nations place in "the United States [to] abide by its treaties." *Id*. The consequence: "the United States risks losing the ability to obtain the extraditions of people who commit crimes here and flee to other countries." *Venckiene*, 929 F.3d at 865; *see also Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (explaining that "the public interest will be served by the United States complying with a valid extradition application" because "[s]uch proper compliance promotes relations between the two countries, and enhances efforts to establish an international rule of law and order").

Here, the United States has a strong interest in having extradition requests submitted by Türkiye (and other treaty partners) resolved promptly, both to comply with its treaty obligations and to further its reciprocal interest in having other nations cooperate swiftly with its own extradition requests and other law enforcement objectives. "At some point all litigation must end," and there is "no compelling reason for further delaying this one." *Jimenez*, 84 S. Ct. at 19.

19

## CONCLUSION

For the foregoing reasons, the Court should deny T.C.'s habeas petition and his motion to stay extradition.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant United States Attorney

Dated: June 11, 2026

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant United States Attorney

Dated: June 11, 2026